# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
January 28, 2020

Lyle W. Cayce
Clerk

No. 18-31275

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP, P.L.C.,

Requesting Parties - Appellants

v.

CLAIMANT ID 100354107,

Objecting Party - Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before OWEN, Chief Judge, and BARKSDALE and DUNCAN, Circuit Judges.

STUART KYLE DUNCAN, Circuit Judge:

Following the disastrous Deepwater Horizon oil spill in 2010, Walmart submitted an economic loss claim under the Deepwater Horizon Settlement Agreement for one of its stores located on the Mississippi Gulf Coast. That store, it turns out, had reopened a mere six months before the oil spill, having been closed ever since it was destroyed by Hurricane Katrina several years earlier. The Settlement Program classified Walmart's submission as a "start-up business" claim and issued a compensation award of nearly $1 million. An appeal panel subsequently affirmed that award. BP sought review in the district court, arguing that Walmart should have been treated as a regular

No. 18-31275

business, not a start-up, and denied compensation altogether. The district court declined discretionary review. We affirm.[1]

## I.

In 2003, Walmart opened "supercenter" #5079 in Pass Christian, Mississippi, just across U.S. Highway 90 from the Gulf of Mexico. The company operated the store for approximately two years, until Hurricane Katrina decimated Pass Christian in August 2005. The hurricane destroyed the store, and what was left of the building was demolished. This photo, looking out over the store's parking lot toward the beach, shows a portion of the destruction:



This is a photo of the structure itself, after cleanup:

---

[1] Chief Judge Owen dissents because, in her view, the district court abused its discretion by declining to review the appeal panel's decision.

No. 18-31275



In the wake of the hurricane, Walmart immediately announced plans to reopen the store. By early 2007, the company had purchased an additional 34 acres of land for the purpose of expanding its Pass Christian operation. Construction of the expanded store began in late 2008 and continued until Fall 2009. All the while, from September 2005 through early October 2009, the Pass Christian Walmart had no revenue. In late July 2009, the City of Pass Christian issued a new annual privilege tax license for the store, effective October 1, 2009 through September 30, 2010. Finally, on October 14, 2009, the rebuilt Walmart #5079 opened to the public.

On April 20, 2010, just six months after the Pass Christian Walmart reopened, the Deepwater Horizon drilling rig exploded in the Gulf of Mexico. Following the spill, BP entered into the Economic and Property Damages Class Action Settlement Agreement with entities that suffered spill-related economic losses. *See generally In re Deepwater Horizon*, 785 F.3d 986, 989 (5th Cir. 2015) (describing history of the Settlement Agreement).

No. 18-31275

The Settlement Agreement provides several compensation frameworks for business entities, including one for regular Business Economic Loss ("BEL") claims and another for Start-Up Business Economic Loss ("SBEL") claims.[2] Both frameworks allow businesses to submit claims for economic losses computed in part by comparing *actual* profits during a post-spill "Compensation Period" to *expected* profits for the same timeframe. The "Compensation Period" is a period of three or more consecutive months selected by the claimant from between May 2010 and December 2010 (for regular BEL claims) or between May 2010 and April 2011 (for SBEL claims). A primary difference between the BEL and SBEL frameworks involves how expected profits are calculated. As described in Exhibit 4C to the Settlement Agreement, the regular BEL framework determines expected profits by looking to a *pre*-spill "Benchmark Period." Specifically, a regular BEL claimant can use financial figures from 2009, the average of 2008–2009, or the average of 2007–2009. To account for the fact that a start-up business would lack such pre-spill figures, the SBEL framework provides for a *post*-spill Benchmark Period.[3] The Benchmark Period for SBEL claimants consists of a period between May 2011 and April 2012 (*i.e.*, one year after the spill) corresponding to the months selected for the claimant's Compensation Period. In other words, regular BEL claimants recover under the Settlement Agreement by showing that profits during the spill year were less than profits during the *preceding* year(s), whereas SBEL claimants recover by showing that profits during the spill year were less than profits the *subsequent* year.

---

[2] The Settlement Agreement also provides compensation frameworks for "Failed Business" and "Failed Start-Up Business" claims, but those frameworks are not at issue here.

[3] Alternatively, SBEL claimants may choose to rely on qualifying financial projections prepared prior to the spill, but that option is not at issue here.

No. 18-31275

The choice of filing a BEL or SBEL claim is not left entirely to the claimant. Rather, the Settlement Agreement expressly defines a "Start[-]Up Business" as one with "less than 18 months of operating history at the time of the Deepwater Horizon Incident." Some early claim-processing paperwork listed "11/1/08" as the cutoff date for SBEL treatment, but the Claims Administrator later issued Policy 381 v.3 explaining that "the correct application of [the Settlement Agreement] is to classify as a Start-Up Business one that commenced operations after 10/20/08 and classify as a general BEL business one that commenced operations on or before 10/20/08." In policy 362 v.2, which addressed how to tell if a start-up business sufficiently established its operations prior to the spill (so as to be eligible for compensation), the Claims Administrator prescribed a "totality of circumstances" analysis focused on, *inter alia*, when the business "began" to sell products or "incur substantial costs or expenses of a nature indicative of the actual start-up of business operations."

In June 2015, Walmart filed an SBEL claim for its Pass Christian store, selecting July 2010–January 2011 as its Compensation Period and July 2011–January 2012 as its Benchmark Period.[4] Based on financial documentation provided by Walmart, the Settlement Program computed a total net compensation of $817,392.13 and issued an award for that amount.

BP challenged this award before an appeal panel, urging that because the Pass Christian Walmart had a "longstanding" history dating back to its 2003 opening, it had more than 18 months of operating history and therefore should not have been treated under the SBEL framework. BP asserted that

---

[4] The Settlement Program later dropped January 2011 from the Compensation Period and January 2012 from the Benchmark Period due to insufficient financial records.

No. 18-31275

Walmart's claim properly belonged within the BEL framework, which, according to BP, would yield an award of $0.

The appeal panel noted BP's arguments but affirmed the award. The panel acknowledged a prior decision finding that a business with no sales to customers from January 2008 until April 2009 did not qualify for SBEL treatment, but observed that Walmart distinguished that case while supplying several other decisions holding that periods of dormancy did not preclude start-up treatment. The appeal panel "agree[d] with the majority" of the decisions and adopted Walmart's Final Proposal.

BP promptly sought discretionary review of the appeal panel decision in the district court. On November 14, 2018, the district court denied BP's request without comment. BP timely appealed.

II.

"We review the district court's denial of discretionary review for abuse of discretion." *Claimant ID 100235033 v. BP Expl. & Prod., Inc.*, 941 F.3d 801, 805 (5th Cir. 2019) (citing *Holmes Motors, Inc. v. BP Expl. & Prod., Inc.*, 829 F.3d 313, 315 (5th Cir. 2016)). Typically, we assess "whether the decision not reviewed by the district court actually contradicted or misapplied the Settlement Agreement, or had the clear potential to contradict or misapply the Settlement Agreement." *Id.* (quoting *Holmes Motors*, 829 F.3d at 315); *see also Claimant ID 100250022 v. BP Expl. & Prod., Inc.*, 847 F.3d 167, 170 (5th Cir. 2017) (per curiam) ("[W]e need not examine whether the [Settlement Program] was actually correct[.]"). However, "it is 'wrong to suggest that the district court must grant review of *all* claims that raise a question about the proper interpretation of the Settlement Agreement.'" *Claimant ID 100212278 v. BP Expl. & Prod., Inc.*, 848 F.3d 407, 410 (5th Cir. 2017) (per curiam) (quoting *Holmes Motors*, 829 F.3d at 316); *see also In re Deepwater Horizon*, 785 F.3d at 999 (noting that "to turn the district court's discretionary review into a

6

mandatory review . . . would frustrate the clear purpose of the Settlement Agreement to curtail litigation"). "It is not an abuse of discretion to deny a request for review that involves no pressing question of how the Settlement Agreement should be interpreted or implemented, but simply raises the correctness of a discretionary administrative decision in the facts of a single claimant's case." *Claimant ID 100212278*, 848 F.3d at 410 (quoting *In re Deepwater Horizon*, 641 F. App'x 405, 410 (5th Cir. 2016) (per curiam) (cleaned up)). "It may be an abuse, however, if the district court denies a request for review that raises a recurring issue on which the Appeal Panels are split if the resolution of the question will substantially impact the administration of the Agreement." *Claimant ID 100235033*, 941 F.3d at 806 (quoting *Claimant ID 100212278*, 848 F.3d at 410) (cleaned up).

## III.

### A.

BP argues that the appeal panel misapplied and contradicted the Settlement Agreement by ignoring its plain language. BP emphasizes that nothing in the Settlement Agreement indicates that the start-up classification requires a *continuous* 18-month period of revenue generation leading up to the spill. Pointing to Policy 381 v.3, BP asserts that a business does not count as a "start-up" if it "commenced operations" on or before October 20, 2008. Further, BP notes that Policy 362 v.2 specifies that the Settlement Program will determine a claimant's operating history based on when the claimant "began doing business or operating in the Gulf Coast Areas[.]" BP thus contends that, because Walmart began doing business in Pass Christian in 2003 and had well over 18 months of operating history by the time of the spill, its claim should have been treated under the regular BEL framework. BP bolsters this argument by stressing that Settlement Agreement terminology like "start-up business" should be interpreted according to ordinary usage, and Walmart's

Pass Christian store, insofar as it opened in 2003, would not be considered a "start-up business" in the ordinary sense.

Walmart responds that the appeal panel properly applied the terms of the Settlement Agreement in light of Policy 362 v.2's "totality of circumstances" test. Walmart contrasts the "previous" Pass Christian store with the "new" store, contending that the former was totally destroyed by Hurricane Katrina and the latter was "not in operation or existence until October 2009." Walmart submits that, at most, BP's appeal raises a question about the correctness of a discretionary decision on the facts of a single case, not a pressing question about how the Settlement Agreement should be interpreted and implemented. Lastly, Walmart argues that BP's position "undermine[s] the entire structure and intent" of the Settlement Agreement because it denies businesses in Walmart's position any compensation. Walmart explains that under BP's view it (1) would not qualify for SBEL treatment because the prior Pass Christian store operated in 2003–2005, and (2) would not qualify for regular BEL treatment because—due to its nonoperation—it lacks financial records for the 2009 Benchmark Period. Walmart dubs this an "absolute Catch-22."

While BP's plain language argument does raise a question about the proper interpretation of the Settlement Agreement, we are not persuaded that the appeal panel decision "actually contradicted or misapplied" the Settlement Agreement or had the "clear potential" to do so. The reason is that the language of the Settlement Agreement does not unambiguously support BP's position, *i.e.*, that a business destroyed by Hurricane Katrina and relaunched too close in time to the Deepwater Horizon oil spill to have sufficient financial records to benchmark a regular BEL claim is nevertheless precluded from treatment under the start-up framework.

In reaching this conclusion, we are guided by the fact that the Settlement Agreement is a maritime contract interpreted in accordance with federal

admiralty law, which dictates that a contract "should be read as a whole and its words given their plain meaning unless the provision is ambiguous." *Holmes Motors*, 829 F.3d at 315 (quoting *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009)). "A provision is not ambiguous if 'its language as a whole is clear, explicit, and leads to no absurd consequences, and as such it can be given only one reasonable interpretation.'" *BP Expl. & Prod., Inc. v. Claimant ID 100262795*, 759 F. App'x 249, 252 (5th Cir. 2019) (per curiam) (quoting *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 n.6 (5th Cir. 2004)). An appeal panel contradicts or misapplies the Settlement Agreement if its finding is "incongruent with the language of the Settlement Agreement[.]" *Claimant ID 100250022*, 847 F.3d at 170; *cf. In re Deepwater Horizon*, 858 F.3d 298, 303–04 (5th Cir. 2017) (reversing district court's approval of policies "inconsistent" with unambiguous text of Settlement Agreement).

As we read it, the definition of "Start-Up Business" in the Settlement Agreement is subject to at least two reasonable interpretations. "[L]ess than 18 months of operating history at the time of the Deepwater Horizon Incident" could mean less than 18 months of *total* operating history. On that interpretation, which BP favors, a business that reopened (after an extended period of dormancy) less than 18 months before the spill would be precluded from SBEL classification if the business previously operated for some substantial period adding up to a total of 18 months or more. But the language could also be read to mean less than 18 months of *continuous* operating history prior to the spill. On that reading, a business with a previous operating history followed by an extended period of dormancy could still be eligible for SBEL classification if its reopening took place less than 18 months before the spill.

At first glance, Policy 381 v.3 appears to provide some clarity, classifying as a regular business one that "commenced operations on or before 10/20/08."

That language seems to suggest—as BP urges—a blanket rule that any business having ever "commenced operations" more than 18 months before the spill must be treated as a regular BEL claimant regardless of dormancies. But such a reading misconceives the applicability of Policy 381 v.3. The stated purpose of the policy was to resolve a discrepancy about the commencement date for SBEL claims because some forms listed "11/1/08" and others listed "10/20/08." The intended effect of the policy was to clarify that a business which "commenced operations" between 10/20/08 and 11/1/08 should be treated under the SBEL framework, not the BEL framework. The policy is silent regarding how to treat a business that, due to an extended period of dormancy, might be said to have *two* operating histories and *two* commencement dates.

Similarly, Policy 362 v.2's instruction to focus on when a business "began" doing business or operating does not resolve the ambiguity. Policy 362 v.2 is addressed to the question of whether a start-up business managed to attain sufficient operational status early enough to be eligible for compensation, *i.e.*, before the date of the spill. The policy does not bear on whether some *prior* operational history, followed by a period of dormancy, disqualifies a business from SBEL classification.[5]

Walmart's structural argument provides evidence that the circumstance here was never even contemplated by the parties to the Settlement Agreement. We find it difficult to believe that the parties intended to foreclose recovery by businesses that suffered spill-related losses mere months after finally resurfacing from the Gulf Coast's previous catastrophe, Hurricane Katrina. Quite to the contrary, the Settlement Agreement instructs the Claims

---

[5] In any event, it is the Settlement Agreement that binds the parties, not policies later promulgated by the Claims Administrator. *See BP Expl. & Prod., Inc. v. Claimant ID 100195328*, 766 F. App'x 141, 145 (5th Cir. 2019) (per curiam) (citing *In re Deepwater Horizon*, 858 F.3d at 300–01).

No. 18-31275

Administrator to select the framework and information that will "produce the greatest economic damage compensation amount[.]" The different frameworks for BEL and SBEL claims were not implemented to favor a particular type of business or restrict recovery for others, but rather "[t]o account for specific circumstances" in a claimant's business that might impede its ability to file a claim under one or the other framework.[6]

In sum, we hold that the appeal panel made a discretionary decision not incongruent with the language of the Settlement Agreement.

## B.

Even though the appeal panel did not actually contradict or misapply the Settlement Agreement on a pressing question of implementation, we might still find abuse of discretion if the district court ignored a split among appeal panels on the issue presented. Indeed, BP argues that appeal panels have "reached different conclusions about how a period of dormancy during which a business generates no revenue affects the classification of the business." BP submits that the panel here flagged this as a recurring issue, and simply adopted the majority approach without independent analysis. This, BP contends, "is precisely the type of issue the district court is required to review." Walmart responds that there is no split "involving claims truly analogous to this claim and the specific facts surrounding it." We agree with Walmart.

To determine whether the district court may have abused its discretion, "we examine a set of appeal panel decisions to see whether they have split on recurring issues with a substantial impact on the Settlement Program."

---

[6] To be sure, we have not been receptive to structural "catch-22" arguments that "ignore[] the settlement agreement itself." *Claimant ID 100068924 v. BP Expl. & Prod., Inc.*, 765 F. App'x 956, 960 (5th Cir. 2019) (per curiam). Nevertheless, Walmart's structural argument undermines the notion that the appeal panel *actually* contradicted or misapplied the Settlement Agreement, especially where, as here, the relevant provision is ambiguous.

No. 18-31275

*Claimant ID 100235033*, 941 F.3d at 808. In addition to the underlying decision, the parties focus our attention on two other appeal panel decisions— one that classified a business with a period of dormancy as a regular BEL claimant and another that classified a business with a period of dormancy as an SBEL.

In APD 2017-3537, the claimant, a Louisville, Mississippi, metal products manufacturer, commenced operations in 2001. According to the Claims Administrator, the business "experienced a dormancy period" with no sales from January 2008 to April 2009. BP pointed out that the business went from paying $58,528 in utility bills in January 2008 to less than $100 in April 2008, and reported no salary or contract labor expenses for 2008 or 2009. Records from 2010 showed that the business began to recognize some sales again in April of that year. In front of the appeal panel, the claimant sought regular BEL treatment, explaining that—due to a "downtrend in the ability to sell its products"—it discontinued production in 2007 and focused on sales of existing inventory until finally ceasing operations in 2013. BP argued for SBEL treatment, pointing out that the claimant "went dormant in January 2008 . . . until April 2010." In what it described as a "close call," the appeal panel rejected BP's argument and applied the regular BEL framework.

In APD 2017-3813, the claimant, a Gulfport, Mississippi, sporting goods store that sold sailboats and watersports equipment, began operations in 2001 but was forced to close in 2005 after Hurricane Katrina. According to the claimant, the business was "completely lost," with no location, inventory, or sales after the hurricane. Eventually, in 2008, the decision was made to re-launch the business. Using the same Employer Identification Number as before, the business began incurring advertising and administrative expenses in July 2008 and recorded its first income in November and December of that year. After a "soft try opening" in 2009, the business fully reopened in 2010

12

and continued operating until July 2012. The Settlement Program applied the regular BEL framework to the claim, producing an award of $0, but the claimant appealed, arguing for SBEL treatment. The appeal panel found that the criteria for SBEL treatment were satisfied, noting the claimant's "second operating history" commenced less than eighteen months before the spill.

BP argues that APD 2017-3537 is inconsistent with both APD 2017-3813 and the underlying decision in the present case. Walmart responds that APD 2017-3537 is distinguishable, whereas APD 2017-3813 is directly on point. The real debate seems to be about framing. BP frames the issue broadly, contending that appeal panels have split on how to treat claims where a "business experiences a period of dormancy during which no new revenue is generated." Walmart frames the issue more narrowly, suggesting there is no split about how to treat "businesses that were completely destroyed by Hurricane Katrina and then opened new stores that commenced operations within 18 months of the spill." Walmart insists that the claim in APD 2017-3537 is "completely different" because it involved an ongoing business that merely suffered a "downtrend" and "never lost its physical facility, never lost all of its customers, and never left the Gulf Coast community."

In our view, Walmart's narrower framing of the issue (which accounts for the circumstances of the dormancy) is more appropriate and, on that framing, there is no split.[7] BP's attempt to frame the issue broadly is belied by BP's own inconsistent positions in the cited appeal panel decisions. One would expect BP—a party to the Settlement Agreement—to maintain a consistent position on discrete issues recurring before appeal panels. Yet on the issue as

---

[7] Indeed, BP admitted at oral argument that besides this case and APD 2017-3813 it was not aware of any other appeal panel decisions involving business claimants whose operations were wiped out by Hurricane Katrina and then resumed in the immediate pre-spill period.

BP frames it, BP has advocated for contradictory positions. Although BP relies heavily on APD 2017-3537 for the sweeping proposition that a period of dormancy can never trigger SBEL treatment, it was BP that argued *for* SBEL treatment in that case *on the very basis of* the metal products manufacturer's period of dormancy.[8]

To be sure, appeal panel decisions need not be factually identical to create a split. In *Claimant ID 100235033*, we held that a split may exist where "each set of facts is unique to some degree, but comparison still is reasonable." 941 F.3d at 810. In that case, we evaluated six other appeal panel decisions and determined that "those panels would likely have reached a different conclusion [than the underlying panel reached] had they handled the Claimant's case." *Id.* at 808. In contrast, nothing in APD 2017-3537 indicates the panel would have reached a different conclusion had it handled Walmart's claim. The metal manufacturer in APD 2017-3537 suffered a business downturn and decided to cease new production and simply sell off its remaining unfinished inventory, which it did until closing for good in 2013. The appeal panel applied regular BEL treatment in what it described as a "close call." Nothing about this outcome indicates that the panel would "likely" have applied regular BEL treatment to Walmart's claim, where Hurricane Katrina destroyed the store and the surrounding community, and where over four years passed before the store managed to commence its second operating history.

Moreover, even if BP was correct that APD 2017-3537 contradicts both APD 2017-3813 and the decision at issue here, that would not be enough to mandate discretionary review. "[O]ne allegedly variant decision will not 'substantially impact the administration of the agreement' and therefore does

---

[8] We also note that BP argued for SBEL treatment in APD 2015-1586 and APD 2015-1762, other cases that involved extended dormancy periods.

not require the district court's review." *Claimant ID 100262194 v. BP Expl. & Prod., Inc.*, 745 F. App'x 539, 541 (5th Cir. 2019) (per curiam) (quoting *Claimant ID 100212278*, 848 F.3d at 410); *see also Claimant ID 100051301 v. BP Expl. & Prod., Inc.*, 694 F. App'x 236, 240 (5th Cir. 2017) (per curiam) ("[T]he fact that Appeal Panels have reached different conclusions for this issue depending on the circumstances of each case does not represent the type of Appeal Panel split that would require the district court's review."). Here, where a singular decision only possibly diverges from the others in a fact-bound "close call," there is little likelihood of substantial impact on the administration of the Settlement Agreement.

In sum, we discern no split among appeal panels on the issue presented, let alone a split likely to have a substantial impact on the Settlement Program.

\* \* \*

Because the underlying appeal panel decision did not actually contradict or misapply the Settlement Agreement on a pressing question of implementation, and because there was no split among appeal panels on the issue presented, the district court did not abuse its discretion by denying review.

AFFIRMED.

15